UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


MARION FAMILY CHIROPRACTIC, INC.,
     Plaintiff,


     v.                              CIVIL ACTION NO. 21-11930-MPK[1]


SEASIDE FAMILY CHIROPRACTIC, LLC, *et al.*,
     Defendants.


MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS (#11).


KELLEY, U.S.M.J.

I. Introduction.

Plaintiff Marion Family Chiropractic, Inc. ("Marion Family") brings this action against Seaside Family Chiropractic LLC ("Seaside Family"), Stacy Tam, and Wesley Stubbs, alleging that Tam left Marion Family to open Seaside Family in violation of an employment agreement, taking clients and confidential information with her. (#1-3). Marion Family asserts several claims against the defendants, including breach of contract against Tam (Count I), breach of the covenant of good faith and fair dealing against Tam (Count II), tortious interference with contract and economic advantage against all defendants (Count III), misappropriation of trade secrets and confidential information against Tam (Count IV), unfair competition against all defendants (Count V), unjust enrichment against all defendants (Count VI), and a Chapter 93A claim against all defendants (Count VII). (#1-3 ¶¶ 37-83.)

---

[1] With the parties' consent, this case was assigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#10.)

1

The case was originally filed in state court and later removed by defendants, who now seek to dismiss the claims against them. (##1, 11-12.) Marion Family opposes. (#17.) For the reasons set out below, defendants' motion to dismiss is allowed in part and denied in part.

II. <u>Legal Standard</u>.

Dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11-12 (1st Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Detailed factual allegations are unnecessary; Rule 8(a)(2) only requires sufficient detail to provide a defendant with fair notice of a plaintiff's claim and the bases for it. *Twombly*, 550 U.S. at 555.

Yet a plaintiff is only entitled to relief if the complaint's factual allegations raise the stated right to relief above a speculative level. *Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion, a complaint must allege enough facts to state a claim that is "plausible on its face." *Id*. at 570; *see Iqbal*, 556 U.S. at 678. A complaint "has facial plausibility" when it alleges enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 556. This is not a "probability requirement" but demands "more than a sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 556.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must "separat[e] a complaint's factual allegations from its legal conclusions." *Ocasio-Hernández*, 640 F.3d at 10. Factual allegations are entitled to a presumption of truth; legal conclusions are not. *Id.*; *see Iqbal*, 556 U.S. at 678. Determining whether a complaint states a facially plausible claim is a "context-

specific task that requires the . . . court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see Ocasio-Hernández*, 640 F.3d at 11. If the court "can[no]t infer from the well-pleaded facts 'more than the mere possibility of misconduct,' then the complaint has not shown 'that the pleader is entitled to relief.'" *Justiniano v. Walker*, 986 F.3d 11, 19 (1st Cir. 2021) (citation omitted) (quoting *Iqbal*, 556 U.S. at 679).

### III. Factual Background.

In the fall of 2007, Dr. Jennifer Eames bought Marion Family Chiropractic, a business based in Marion, Massachusetts. (#1-3 ¶¶ 1, 5.) The purchase included the existing client base and goodwill established over many years of operation. *Id.* ¶ 5. When Eames purchased the practice, Tam was an existing provider for the business; she had signed an employment contract ("Employment Agreement") on July 9, 2007. *Id.* ¶ 6.[2]  The Employment Agreement included a restrictive covenant limiting Tam's ability to compete with Marion Family and solicit its clients and employees, as well as a confidentiality clause regarding the use of Marion Family's "business materials." *Id.* ¶¶ 8-9; #12-2 at 6. Business materials are defined as "practice procedures, business procedures, documents, records, marketing, patient information, referral sources, intellectual[,] verbal, non written [sic] and written communications, and other related private and confidential information specific to" Marion Family. (#12-2 at 6.)

In connection with the noncompetition clause, for two years after her termination or departure from Marion family, Tam promised not to compete within ten miles ("as the crow flies")

---

[2] Marion Family refers to the Employment Agreement and its terms throughout its complaint. *See, e.g.*, #1-3 ¶¶ 6, 8-9, 18-20. "When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *see also* #12-2 (copy of employment agreement attached as an exhibit to defendants' memorandum in support of their motion to dismiss).

of Marion Family. (#1-3 ¶ 8; #12-2 at 6.) Competition is defined as including, but not being limited to, "silent partnerships, marketing to existing referral sources, business consulting, diverting patients, contacting patients, contacting employees of the Employer, insurance companies, or anyone/anything associated with the Employer's place of business." (#12-2 at 6.)

For over ten years, Marion Family increased its client base and earned increased revenue for both the business and its providers. (#1-3 ¶ 10.) In 2010, Tam requested and was awarded a raise to receive 50% of receipts, up from 35%. *Id.* ¶ 11; #12-2 at 2. In February 2019, she asked for another raise but Marion Family declined her request. (#1-3 ¶ 12.) After this, her behavior noticeably changed. *Id.* For example, in May 2019, she prevented Marion Family from being able to access her Medicare Provider Enrollment, Chain, and Ownership System, which is an important part of the re-credentialing process that Marion Family undertakes as a service to its providers. *Id.* ¶ 13. She also asked to install noise machines inside treatment rooms so that providers could ensure their conversations would not be overheard. *Id.* On July 31, 2019, Tam suggested and insisted that Marion Family increase its non-insurance rates beginning September 1, 2019. *Id.* ¶ 15.

Meanwhile, on July 29, 2019, an organization whose sole trustees are Tam and Stubbs purchased the Fairhaven, Massachusetts location where Seaside Family now operates. (#1-3 ¶¶ 2, 14.) Tam and Stubbs are also managing members of Seaside Family. *Id.* ¶¶ 3-4. The Fairhaven location is approximately 8.41 miles from Marion Family's location in Marion, as the crow flies. *Id.* ¶ 21. Nearly one month after purchasing the property, on August 27, 2019, Tam submitted her letter of resignation to Marion Family. *Id.* ¶ 16. Although her Employment Agreement required sixty days' notice before departure, Tam requested and was allowed only thirty days, therefore her last day with Marion Family was September 27, 2019. *Id.* Before that date, on September 11, 2019, Tam's and Stubbs' application for registration of a foreign professional limited liability company

(Seaside Family) was approved, and listed both Tam and Stubbs as organizational managers. *Id.* ¶ 22.

During an office meeting at Marion Family on August 28, 2019, Tam announced her departure. (#1-3 ¶ 17.) At the meeting, staff were advised, as on previous occasions when a provider left, to assign Tam's existing clients to the remaining two providers. *Id.* In addition, staff were told how to communicate with clients about Tam's departure, including by telling clients that Marion Family would retain Tam's notes and records for continued care at the practice. *Id.* Tam did not object to or raise any questions about these instructions. *Id.*

Despite this, Tam intentionally diverted a significant number of clients from Marion Family to her new Seaside Family practice. (#1-3 ¶ 23.) Marion Family alleges that this was accomplished through Tam's disparaging comments about Marion Family during visits with her clients at Marion Family. *Id.* Eames and Marion Family staff began to notice that, as clients left Tam's office after treatments, they would walk quickly past the front desk and would not make a follow-up appointment. *Id.* ¶ 24. Marion Family believes that Tam told its clients to either delay scheduling these appointments until Seaside Family was operational, or scheduled them to meet her at alternative locations. *Id.* ¶ 26.

On August 8, 2019, a Marion Family client told staff that he would schedule his next appointment at Tam's Fairhaven location. (#1-3 ¶ 26.) Staff were confused as they had not yet learned of Tam's plans to open her own practice, nor had she tendered her resignation. *Id.* ¶¶ 16, 26. On September 19, 2019, staff asked a long-time Marion Family client if she wanted to schedule her next appointment and were told that Tam had already made her an appointment, though it was not with Marion Family. *Id.* ¶ 27. Later that day, when Eames confronted Tam, she refused to say whether she was scheduling Marion Family clients to see her at a new practice. *Id.* ¶ 28.

After Tam left, in October 2019, a different client told a staff member at Marion Family that they no longer planned to see Tam at Seaside Family because the client did not like things Tam had been saying about Marion Family and its employees. (#1-3 ¶ 29.) On October 14, 2019, another client told Eames that Tam wanted her to start making appointments at Seaside Family, but that the client did not want to do so; the client had last seen Tam at Marion Family on September 17, 2019, prior to Tam's departure on September 27th. *Id.* ¶ 30. Further, on January 1, 2020, a former Marion Family employee and referral source posted the following message on Facebook: "In September, Dr. Tam and I set out on our long-awaited dream of opening a practice together, and we moved the offices to Fairhaven. I know the drive is longer for some of you, and I appreciate you making the effort to come see us!" *Id.* ¶ 31. Marion Family contends that this message refers to its own clients being diverted to Seaside Family, which would require clients to drive further away. *Id.* In all, Tam diverted over 371 clients from Marion Family to Seaside Family. *Id.* ¶ 32.

Between October and November 2019, Tam texted a Marion Family staff member and asked questions about the business. (#1-3 ¶ 34.) The staff member became uncomfortable and ended contact with Tam. *Id.* Marion Family alleges that Tam also contacted one of its providers to request information about the business. *Id.* In addition, Tam took Marion Family's business materials and used them for herself and Seaside Family. *Id.* ¶ 35. This included a comic that Marion Family had licensed for its own use. *Id.* ¶ 36.

6

IV. <u>Discussion</u>.

A.  <u>Breach of Contract (Count I)</u>.

Defendants raise several grounds for dismissing the breach of contract claim. (#12 at 7-12.)

"Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *In re Bos. Univ. Covid-19 Refund Litig.*, 511 F. Supp. 3d 20, 23 (D. Mass. 2021) (quoting *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013)). "For a breach-of-contract claim to survive a motion to dismiss, the complaint 'must do more than allege, in a conclusory fashion, that the defendant breached the contract.'" *Michel v. LoanCare, LLC*, No. 21-cv-11018-FDS, 2022 U.S. Dist. LEXIS 21149, at *8 (D. Mass. Feb. 7, 2022) (quoting *Hogan v. Teamsters Local 170*, 495 F. Supp. 3d 52, 58 (D. Mass. Sept. 30, 2020)). "Instead, it must allege, with 'substantial certainty,' the specific contractual obligation that the defendant breached." *Id.* (quoting *Hogan*, 495 F. Supp. 3d at 58).

1.  <u>Whether Noncompete Agreements Are Enforceable Against Medical Professionals</u>.

Defendants first argue that Marion Family's claim for breach of contract fails because noncompete agreements ("NCAs") are unenforceable against medical professionals, including chiropractors. (#12 at 7-9.)

Defendants note that, by statute, Massachusetts law prohibits restrictive covenants from being enforced against physicians, registered nurses, and psychologists. (#12 at 7 (citing Mass. Gen. Laws ch. 112, §§ 12X, 74D, 129B).) They ask the court to interpret Chapter 112 broadly so as to apply the same prohibition to protect chiropractors. *Id.* Chapter 112, however, includes

sections applicable to dentists, opticians, optometrists, and dieticians—as well as chiropractors. None of these other sections, however, include a prohibition against restrictive covenants. The legislature clearly made a choice about which professions to protect from restrictive covenants, making it inappropriate for the court to read the protections as applying to non-enumerated professions. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (explaining that "the canon *expressio unius est exclusio alterius* . . . . has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence").

In further support for this broad reading of Chapter 112, defendants cite a 2001 case from the Massachusetts Superior Court. (#12 at 8 (citing *Merolla Chiropractic, Inc. v. Jonathan Susskind, D.C. et al.*, No. C01-1030, 2004 WL 4968069 (Mass. Super. Aug. 30, 2001)).) Defendants are correct that the court, in deciding a motion for preliminary injunction, indicated that the plaintiff was unlikely to succeed on his breach of contract claim because the restrictive covenant could not apply to a chiropractor. However, "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). This proved to be the case when, as *Merolla* progressed through litigation, the court granted a directed verdict for plaintiff on his breach of contract claim. *See* #17-3 at 6 (copy of *Merolla* docket).

For these reasons, Chapter 112 does not limit the enforceability of NCAs against chiropractors.

    2.   Whether Tam Consented to Assignment of the Employment Agreement.

Defendants next argue that Marion Family is not a party to the Employment Agreement and that Tam did not consent to assignment of the Employment Agreement. (#12 at 9-10.)

The Employment Agreement is between "Alicia M. Crabbe, dba Marion Family Chiropractic, its successors and assigns." (#12-2 at 2.) The subsequent line reads, "[w]hereas Alicia M. Crabbe dba Marion Family Chiropractic, its successors and assigns . . . wishes to offer employment to Doctor Stacy Tam . . ." *Id.* Defendants state that "Marion Family Chiropractic" is distinct from "Marion Family Chiropractic, Inc.," which was not established until January 1, 2008—nearly six months after Tam entered into the Employment Agreement on July 9, 2007. (#12 at 3 n.3, 9-10.) Further, Tam contends that she did not agree to the assignment of the Employment Agreement to Marion Family, despite the fact that the Agreement contemplates assignment through the inclusion of the phrase "successors and assigns" and Tam's continued employment with Marion Family until her departure in September 2019. (#12 at 9-10; #1 ¶ 16.)

In *Securitas Security Services USA, Inc. v. Jenkins*, the court noted that an employment agreement could not be assigned to another corporate entity without the employee's assent. No. 03-2950, 2003 Mass. Super. LEXIS 200, at *14-15 (July 18, 2003). That case, however, involved distinct facts where an employee resigned prior to assignment and sought to prevent the assignor from enforcing an NCA. *Id.* at *2-3. Here, Marion Family has alleged that Tam continued working for it after it purchased the business from Crabbe in 2007, and that Tam remained with the company until 2019. Further, the Employment Agreement specifically references assigns and indicates that assigns may employ Tam. (#12-2 at 2.) In any case, several courts have either refused to apply *Securitas* or departed from it to find that an NCA was enforceable on assignment. *See HCC Specialty Underwriters, Inc. v. Woodbury*, No. 16-cv-501, 2017 U.S. Dist. LEXIS 83812, at *6 (D.N.H. June 1, 2017) ("Defendants cite *Securitas* as standing for the principal that under Massachusetts law, non-competition obligations in employment contracts are unassignable. No such principal exists under Massachusetts law."); *Hilb Rogal & Hobbs of Mass. v. Sheppard*, No.

07-5549, 2007 Mass. Super. LEXIS 609, at *19 (Jan. 7, 2008) (finding likelihood of success on the merits for plaintiff seeking to enforce NCA where employment agreement provided for assignment).

In *Qestec, Inc. v. Krummenacker*, the court found that the parties' conduct indicated that an employment agreement had been renewed because "[b]y continuing to work as a sales executive and receive a salary [defendant] implicitly assented to renewal of the [employment agreement]. Similarly, by employing him and paying the requisite salary, [plaintiff] implicitly assented to renewal." 164 F. Supp. 2d 172, 178 (D. Mass. 2001) (citing *Mahoney v. Hildreth & Rogers Co.*, 125 N.E.2d 788 (Mass. 1955)); *see F.A. Bartlett Tree Expert Co. v. Barrington*, 233 N.E.2d 756, 758 (Mass. 1968) (finding no error where lower court determined "that the conduct of the parties show[ed] a clear new employment contract" despite the employee's refusal to sign a new employment agreement). Similarly, the period of over ten years' employment with Marion Family suggests that Tam did, through her conduct, assent to the assignment and annual renewal of the Employment Agreement.

### 3.  Whether There Was a Material Change in Tam's Employment.

Defendants claim that the change in Tam's employer, from Crabbe to Marion Family, was a material change to her employment that rendered the NCA unenforceable. (#12 at 11.) For the reasons discussed above, courts have found that assignment—a change in employer—does not render an NCA unenforceable. In support of their position, defendants cite *F.A. Bartlett Tree Expert Co. v. Barrington*, in which the Supreme Judicial Court refused to enforce an NCA contained in a prior employment agreement where material changes to the employee's position included changes to salary, title, and sales territory, and the parties' conduct suggested assent to a new employment agreement. 233 N.E.2d at 758. "The material change doctrine was created to

address situations in which 'parties had abandoned their old arrangement and had entered into a new relationship' . . . ." *NuVasive, Inc. v. Day*, No. 19-cv-10800, 2019 U.S. Dist. LEXIS 90388, at *11 (D. Mass. May 29, 2019) (quoting *F.A. Bartlett*, 233 N.E.2d at 758).

Aside from assignment to Marion Family, a new entity—which was provided for by the Employment Agreement and to which Tam apparently assented through her conduct of continued employment—the only potentially material change in Tam's relationship with Marion Family is the 2010 increase in her salary. The Employment Agreement Tam signed in 2007 set forth the percentage of her compensation from net receivables and noted that "[t]his percentage will be 35% initially, subject to change based upon the employee's periodic reviews and contribution to the practice, and at the Employer's sole discretion." (#12-2 at 2.)

Courts have found that where an employment contract contemplates a salary increase, any subsequent increase is not a material change that would render a preexisting employment agreement void. *See Qestec, Inc.*, 164 F. Supp. 2d at 177 ("The fact that his salary was increased is irrelevant because the [employment agreement] provided for salary increases."). In addition, courts have indicated that salary changes are not material. *See id.* (distinguishing *F.A. Bartlett*, where numerous other changes in employment were alleged); *see also Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 16 (1st Cir. 2009) (distinguishing *F.A. Bartlett* as being limited to its facts, where employee refused to sign new employment agreement and the parties' conduct suggested abandonment of the original agreement); *NuVasive, Inc.*, 2019 U.S. Dist. LEXIS 90388, at *11 (noting in dicta that material change doctrine was inapplicable where employment agreement explicitly stated that changes in compensation would not affect the validity of the agreement); *Anaqua, Inc. v. Bullard*, No. 14-01491, 2014 Mass. Super. LEXIS 219, at *11 (July 24, 2014) ("*Bartlett* held only that on the facts of that case, '[t]he conduct of the parties from 1960

11

to the date the defendant terminated his employment relationship with the plaintiff [was] inconsistent with an intention that the 1948 contract be continued in effect.'" (alteration in original) (quoting *F.A. Bartlett*, 233 N.E.2d at 758)); *Getman v. USI Holdings Corp.*, No. 05-3286, 2005 Mass. Super. LEXIS 407, at *3 (Sept. 1, 2005) (Gants, J.) (noting that salary and commission fluctuations over time were not material changes to employment agreement containing an NCA where agreement contemplated such fluctuations).

Here, the possibility of a salary increase was set out in the Employment Agreement. Taking the facts alleged as true, the court cannot find that the Employment Agreement had been abandoned by the parties or that the NCA was unenforceable due to a material change.

4.   Whether the NCA Violates the Massachusetts Noncompete Act.

As a final attack against Marion Family's breach of contract claim, defendants argue that the 2019 auto-renewal of the Employment Agreement renders the NCA provision unenforceable under the Massachusetts Noncompetition Agreement Act ("MNAA"). (#12 at 11-12.) Marion Family asserts that, because the Employment Agreement was entered into before 2019 and was subsequently extended or renewed rather than redrafted as a new contract, it is not subject to the MNAA. (#17 at 11-12.)

The MNAA "applies only to agreements entered on or after October 1, 2018." *NuVasive, Inc. v. Day*, No. 19-cv-10800, 2019 U.S. Dist. LEXIS 175090, at *15 (D. Mass. Oct. 9, 2019). By its terms, the MNAA does not apply to: "covenants not to solicit or transact business with customers, clients, or vendors of the employer." Mass. Gen. Laws ch. 149, § 24L; *see NuVasive, Inc.*, 2019 U.S. Dist. LEXIS 175090, at *15 (noting that "the MN[A]A . . . only applies to a narrowly defined subset of non-competition agreements"). To the extent the Employment Agreement's NCA provisions extend beyond such a covenant, the court must determine whether

the July 2019 renewal of the Employment Agreement created a new contract, or merely continued the parties' existing contract.

The Employment Agreement defines its term as follows:

The term of this Employment Contract will be for twelve (12) months commencing on July 9, 2007 and shall automatically extend year to year thereafter on the same terms and conditions contained herein unless either party gives prior notice in writing not less than sixty (60) days prior to the expiration of this Employment Contract or any extension thereof that this Contract is terminated.

(#12-2 at 3.) The Employment Agreement was therefore an evergreen contract. *Contract*, Black's Law Dictionary (11th ed. 2019) (defining an evergreen contract one "that renews itself from one term to the next in the absence of contrary notice by one of the parties"); *O'Neill v. Sch. Comm. of N. Brookfield*, 982 N.E.2d 1180, 1186 n.10 (Mass. 2013) ("Evergreen clauses operate to extend *all* contractual terms beyond the termination date of that agreement."). "In general, automatic renewal provisions are enforceable in Massachusetts." *Comets Cmty. Youth Ctr. v. Town of Natick*, No. 97-01405, 1998 Mass. Super. LEXIS 376, at *7 (1998). Although the Employment Agreement could have been cancelled with notice, "[s]ince [defendants] do[] not contend that such notice was given" prior to August 2019, "the contract remained in force on its face." *Seagram Distillers Co. v. Alcoholic Beverages Control Comm.*, 519 N.E.2d 276, 282 (Mass. 1988). In addition, "the parties continued to abide by the terms of the contract." *Id.* In other words, renewal did not create a new contract, but instead the existing contract—with the same terms and conditions—continued in force from year to year. Because the parties entered into the Employment Agreement in 2007 and continued performing according to the terms of the Agreement until September 2019, on the facts alleged the MNAA does not apply to the Agreement's NCA provision.

B.  <u>Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)</u>.

Defendants also challenge Marion Family's breach of the covenant of good faith and fair dealing claim on the basis that it simply alleges breach of contract. (#12 at 12-14.) Marion Family contends that its claim alleges conduct that goes beyond a mere breach of contract. (#17 at 12.)

"Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing. This implied covenant may not be 'invoked to create rights and duties not otherwise provided for in the existing contractual relationship,' but rather concerns the manner of performance." *Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 685 (Mass. 2005) (citations omitted) (quoting *Uno Rests., Inc.* v. *Boston Kenmore Realty Corp*., 805 N.E.2d 957, 964 (Mass. 2004)). A breach of the implied covenant "requires 'conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage.'" *Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*, 477 F. Supp. 2d 366, 374-375 (D. Mass. 2007) (quoting *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005)). "In order to prevail on this claim, plaintiffs must show that defendant 'acted with . . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing.'" *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 353 (D. Mass. 2011) (alteration in original) (quoting *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996)). "Harms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or 'unfair subterfuge' and usually are 'compounded by deceptive or unfair behavior that prevented—or at a minimum diverted—the injured parties from seeking immediate redress.'" *Blue Hills Office Park LLC*, 477 F. Supp. 2d at 383 (quoting *Christensen*, 360 F. Supp. 2d at 226).

In support of its claim, Marion Family cites Tam's solicitation of its clients, taking of its proprietary information, and concealment of her improper conduct. (#17 at 12.) The first two allegations suggest a breach of contract, as both activities are expressly prohibited by the Employment Agreement. (#12-2 at 6 (provisions regarding solicitation and use of proprietary information).) Statements about Tam's efforts to conceal her actions—through use of a sound machine to mask her conversations with clients; asking clients not to tell Marion Family staff about her plans to open her own practice; and her efforts to get Marion Family to raise its prices just prior to her departure to start a competing practice—plausibly allege bad faith in support of Marion Family's breach of implied covenant claim.

C.   <u>Tortious Interference with Economic Advantage and Contract (Count III)</u>.

Marion Family brings a claim for tortious interference with economic advantage and contract against all defendants, who raise several grounds for dismissing the claim. (#12 at 14-15.) As Marion Family notes, however, each ground relates to arguments presented in support of their challenges to the breach of contract claim. (#17 at 13.) Having denied defendants' motion to dismiss the breach of contract claim, these arguments are moot.

D.   <u>Misappropriation of Trade Secrets (Count IV)</u>.

Tam seeks to dismiss the misappropriation of trade secrets claim because she believes it relies solely on an allegation that she took a public image, rather than any confidential information belonging to Marion Family. (#12 at 15-17.) Marion Family argues that it more broadly "alleges that Defendant Tam improperly accessed and used internal business materials, including new referral sources, its clients' identifying and contact information." (#17 at 13.) In reviewing the complaint, such allegations are not explicit, but can be drawn by reasonable inference. *See Iqbal*, 556 U.S. at 678. For example, if Tam did ask Marion Family clients to schedule appointments at

15

Seaside Family, she likely would have had access to their contact information. *See, e.g.*, #1-3 ¶¶ 23-26.

In Massachusetts,

to prevail on a misappropriation of trade secrets claim . . ., [plaintiff] must demonstrate: (1) the existence of a trade secret; (2) that [plaintiff] took reasonable steps to preserve the secrecy of the trade secret; and (3) that the . . . Defendants "used improper means, in breach of a confidential relationship, to acquire the trade secret."

*Frontrunner HC, Inc. v. Waveland RCM, LLC*, No. 20-cv-10230-DJC, 2020 U.S. Dist. LEXIS 232890, at *28-29 (D. Mass. Dec. 11, 2020) (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994)).

"Under Massachusetts law, non-technical confidential information such as customer or supplier lists can qualify as a protected trade secret." *KPM Analytics N. Am. Corp. v. Blue Sun Sci.*, No. 21-cv-10572-TSH, 2021 U.S. Dist. LEXIS 249631, at *23 (D. Mass. Aug. 23, 2021); *Optos, Inc. v. Topcon Med. Sys.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (finding that customer list was a trade secret); *see also Bruno Int'l Ltd. v. Vicor Corp.*, No. 14-cv-10037-DPW, 2015 U.S. Dist. LEXIS 123556, at *41 (D. Mass. Sep. 16, 2015) (noting that customer lists "can constitute trade secrets where the information provides its holder with a competitive advantage"). Marion Family alleges that it built a successful practice over many years and that Tam took over 371 customers, suggesting that she received a competitive advantage through having access to this information as she established her new business, Seaside Family. Although Marion Family has not provided details about the customer information Tam is alleged to have taken, at this preliminary stage the court finds that it has plausibly alleged the information was a trade secret.

Although it is not clear from the complaint whether Marion Family required all employees to sign an agreement not to disclose its business materials, it asserts in its opposition that it did so. (#17 at 13.) Further, Tam herself signed such an agreement. (#12-2.) Defendants do not contend

that Marion Family publicized its customer information and, in any case, the court must take Marion Family's allegations about its efforts to keep its information confidential as true. Lastly, Marion Family has clearly alleged that Tam used improper means to acquire the information. The court finds that, at this preliminary stage of the proceedings where it must take a plaintiff's allegations as true, Marion Family has plausibly alleged a misappropriation claim against Tam.

E. <u>Unfair Competition (Count V)</u>.

Defendants seek to dismiss this claim on the ground that Marion Family's trade secret allegations cannot support a common law claim of unfair competition. (#12 at 17-18). Marion Family's opposition addresses this ground in two sentences, citing *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 168-69, (1979), in support of its contention that misappropriation of trade secrets can form the basis of a common law claim of unfair competition. (#17 at 14.) That case, however, does not reference a common law claim of unfair competition, but instead a common law claim of misappropriation of trade secrets, and the pages cited by Marion Family are specific to a common law misappropriation claim. *See Jet Spray Cooler*, 377 Mass. at 168 (discussing misappropriation claim as requiring a trade secret, breach of a confidential relationship by the defendant, and defendant's use of the information without permission). Nor does the opinion make reference to "unfair competition" beyond citations to two treatises with the words "unfair competition" in the titles. *Id.* at 170.

The First Circuit has noted that "Massachusetts law provides two distinct theories of recovery based on the improper use of confidential information: misappropriation of trade secrets and unjust enrichment." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 61 (1st Cir. 2009). Absent is any mention of a third theory under a claim of unfair competition. *See id.* This is consistent with the majority of cases addressing a common law unfair competition

17

claim, which do so in the context of trademark infringement rather than trade secrets or confidential information. *See, e.g.*, *T.H. Glennon Co. v. Monday*, No. 18-cv-30120-WGY, 2020 U.S. Dist. LEXIS 45917, at *47 (D. Mass. Mar. 17, 2020) (reciting elements related to consumer confusion between similar marks); *Datacomm Interface, Inc. v. Computerworld, Inc.*, 489 N.E.2d 185, 191 (Mass. 1986) (same). Yet "Massachusetts state law has a more expansive understanding of unfair competition than do other states." *Malden Transp., Inc. v. Uber Techs., Inc.*, 286 F. Supp. 3d 264, 278 (D. Mass. 2017). In *Malden Transportation, Inc.*, the district court denied a motion to dismiss both Chapter 93A and unfair competition claims where the plaintiff alleged that Uber unfairly competed by avoiding local regulations applicable to taxis. *Id.* at 273, 279. Similar allegations were allowed to support a claim of unfair competition in a related case against Uber. *See Bos. Cab Dispatch, Inc. v. Uber Techs., Inc.*, No. 13-10769-NMG, 2014 U.S. Dist. LEXIS 42063, at *18 (D. Mass. Mar. 27, 2014) (adopting report and recommendation).

Here, however, Marion Family's unfair competition claim is based solely on allegations of misappropriation of confidential information and trade secrets. (#1-3 ¶¶ 68-71.) Marion Family, defendants, and this court have been unable to identify a case that would allow Marion Family to sustain both a claim of common law misappropriation of trade secrets and common law unfair competition based on misappropriation of trade secrets. The claim is therefore dismissed without prejudice.

F. <u>Unjust Enrichment (Count VI)</u>.

Defendants argue that Marion Family has not identified a benefit that was conferred on them, and therefore cannot meet the first element of an unjust enrichment claim. (#12 at 18.) In addition, defendants argue that a benefit must be directly conferred on a party, but that Marion Family did not directly confer any benefit on Seaside Family or Stubbs. *Id.* at 18-19.

In Massachusetts,

> unjust enrichment is the "retention of money or property of another against the fundamental principles of justice or equity and good conscience. To succeed on a claim for unjust enrichment, a plaintiff must show (1) a benefit conferred upon defendant by plaintiff, (2) an appreciation or knowledge by defendant of the benefit, and (3) that acceptance or retention of the benefit under the circumstances would be inequitable without payment for its value."

*Infinity Fluids Corp. v. Gen. Dynamics Land Sys.*, 210 F. Supp. 3d 294, 309 (D. Mass. 2016)

(quoting *Biltcliffe v. CitiMortgage, Inc.*, 952 F. Supp. 2d 371, 380 (D. Mass. 2013)).

Marion Family's unjust enrichment claim alleges that it "expended and continues to expend substantial resources in order to enhance its business" and that defendants' wrongful conduct enriched them at Marion Family's expense. (#1-3 ¶¶ 72-75.) In their opposition, Marion Family more specifically alleges that defendants unfairly received and made use of the benefit of its confidential business information and its clients' identifying information. (#17 at 14.) Marion Family has sufficiently identified the benefits allegedly conferred on Tam. With respect to Seaside Family and Stubbs, however, defendants are correct that Marion Family has not alleged that it directly provided any information or benefit to them.

> Unlike trade secrets law, which will allow recovery against a defendant who received the plaintiff's trade secret from a third party, unjust enrichment requires that the plaintiff directly bestowed a benefit on the defendant. No cause of action lies where a plaintiff discloses the trade secret to a third party, who then disclosed the trade secret to defendant.

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, No. 21-cv-10572-TSH, 2021 U.S. Dist. LEXIS 132167, at *47 (D. Mass. July 15, 2021). Marion Family alleges only that Tam took materials and information that it provided to her and that she then shared those with Seaside Family and Stubbs. It does not allege that it gave this information directly to Seaside Family or Stubbs, therefore the claim of unjust enrichment as to both must be dismissed. *See Blake v. Prof'l Coin Grading Serv.*,

898 F. Supp. 2d 365, 390 (D. Mass. 2012) ("[Plaintiff's] claim in this regard fails to state that the benefit was 'conferred upon the defendant *by the plaintiff*.'" (citation omitted)).[3]

## G.  Chapter 93A (Count VII).

Defendants' sole basis for dismissal of Marion Family's Chapter 93A claim is that employment disputes are outside the scope of the statute. (#12 at 19-20.) As Marion Family notes, however, the Massachusetts Supreme Judicial Court has recently clarified that "the inapplicability of G. L. c. 93A, § 11, to disputes arising from an employment relationship does not mean that an employee never can be liable to its employer under G. L. c. 93A, § 11." *Governo Law Firm LLC v. Bergeron*, 166 N.E.3d 416, 425 (Mass. 2021). "Where an employee misappropriates his or her employer's proprietary materials during the course of employment and then uses the purloined materials in the marketplace, that conduct is not purely an internal matter; rather, it comprises a marketplace transaction that may give rise to a claim under G. L. c. 93A, § 11." *Id.* Just so here, where Tam is alleged to have taken Marion Family's confidential information for use after she left

---

[3] Although not raised by defendants, the court notes that "[u]nder Massachusetts law, the existence of a contractual relationship between the parties typically precludes an unjust enrichment claim arising out of that contract." *Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925, 931 (1st Cir. 2014); *see Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) ("Massachusetts law does not permit litigants 'to override an express contract by arguing unjust enrichment.'" (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006))); *Hebert v. Vantage Travel Serv.*, 444 F. Supp. 3d 233, 245 (D. Mass. 2020) ("Unjust enrichment, however, is a doctrine of quasi-contract that does not apply where an actual contract controls the parties' rights."). "It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." *Shaulis*, 865 F.3d at 16. Marion Family has an adequate remedy at law as to Tam arising out of their contractual relationship. Even so, the court will allow the claim to proceed to allow Marion Family an alternative form of relief should the validity of the contract between it and Tam be called into question as the case proceeds through discovery. *See Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012) ("Although [defendant] is correct that damages for breach of contract and unjust enrichment are mutually exclusive, . . . it is accepted practice to pursue both theories at the pleading stage." (citation omitted)).

the business to begin practicing at her new venture, Seaside Family. Dismissal is unwarranted on this ground.

H. <u>Allegations as to Stubbs</u>.

As a final point, defendants seek to dismiss the claims against Stubbs, arguing that the complaint does not sufficiently allege any wrongdoing on his part. (#12 at 20.) Stubbs is a managing member of Seaside Family along with Tam. Defendants note that Tam and Stubbs are married, therefore the court must make the reasonable inference that Stubbs knew Tam was soliciting Marion Family clients to populate Seaside Family's appointment roster. *See* #12 at 2, 4. Discovery will reveal what role he played, if any, in Tam's alleged efforts to divert Marion Family customers to Seaside Family and to disparage plaintiff's business. Dismissal as to Stubbs is therefore inappropriate at this time.

V. <u>Conclusion</u>.

For the reasons discussed herein, defendants' motion to dismiss (#11) is ALLOWED in part and DENIED in part. Count V, a claim of unfair competition against all defendants, is dismissed. Count VI, a claim of unjust enrichment, is dismissed as to Seaside Family and Stubbs only.

April 4, 2022

/s/ M. PAGE KELLEY
M. Page Kelley
Chief United States Magistrate Judge